IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LEGINA and TODD THOMAS**

    Plaintiffs,

v.                                                 CIV 12-381 JCH/LAM

**DR. MARY KAVEN, Ph.D.,
JILL STRAIT, and
DR. ANILLA DEL FABRO, M.D.,**
in their individual capacities,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' *Motion to Dismiss Based on Defendants' Absolute Immunity and Qualified Immunity Protections* (Doc. 11). In the underlying action, Plaintiffs LeGina and Todd Thomas accuse Defendants – staff members at the University of New Mexico Children's Psychiatric Center ("UNMCPC") – of violation of their Fourteenth Amendment rights to familial association and to direct their minor daughter's medical care.[1] In support of the instant motion, Defendants argue that they are entitled to absolute immunity from suit, or alternatively, that they are entitled to qualified immunity, because Plaintiffs have not established that their conduct violated Plaintiffs' clearly-established constitutional rights. The Court having considered the Complaint, motion, briefs, and the relevant law, and being otherwise fully informed, finds that Defendants' motion should be granted.

---

[1] Plaintiffs indicate in their response brief that they wish to dismiss their other cause of action, "Claim for Damages No. 1: Retaliation Against Protected Speech First Amendment Violation." (Doc. 1 Cplt. ¶¶ 59-62). Accordingly, the Court deems such claim abandoned.

## ALLEGATIONS IN THE COMPLAINT

Plaintiffs LeGina and Todd Thomas are the parents of "M.T.," a minor girl, who was twelve years old at the time of the events in issue.  On or about April 12, 2010, Plaintiffs learned that M.T. may have had sexual contact with a friend's older brother while at a sleepover at the friend's house a few days earlier.  The facts surrounding the encounter were unclear.  Plaintiffs asked the Lea County Sheriff's Department to investigate the matter.

### M.T. Transferred to UNMCPC After Expressing Suicidal Thoughts

During the investigation, M.T. told the investigating officer that she wanted to harm herself.  The officer became concerned that M.T. was suicidal, and asked another officer to conduct a suicide prevention screen.  The latter officer found that M.T. was at risk of self-harm, and M.T. was transported to Nor-Lea General Hospital in Lovington, New Mexico.

After evaluating M.T., Nor-Lea Hospital staff and representatives from the local department of Children, Youth, and Families ("CYFD") were concerned that M.T. was threatening to harm herself and had stated that she did not want to return to her family home. Plaintiffs allege that an unidentified CYFD representative then told LeGina Thomas that if she did not consent to transfer her daughter to UNMCPC in Albuquerque – a five-hour drive from Plaintiffs' home in Lovington – for a mental health evaluation, CYFD would assume custody of M.T.  Plaintiffs consented to the transfer and evaluation.

On or about April 13, 2010, M.T. was admitted to UNMCPC. During patient intake, Plaintiffs explained to hospital staff that while they were concerned about M.T.'s statements expressing suicidal thoughts, they were inclined to believe that she "was not truly suicidal and was claiming she was in order to divert attention from the incident with her friend's older brother." (Doc. 1 Cplt. ¶ 15).  Plaintiffs explained that M.T. had not displayed any symptoms of

suicidal tendencies until questioned by the investigating officer.  The Complaint notes that M.T. reported during intake that she had previously attempted suicide *thirty* times; that she subsequently reported that she had previously attempted suicide *three* times; and that Plaintiffs themselves reported to hospital staff that M.T. had *never* attempted suicide.

**Del Fabbro's Initial Diagnosis Rejected by Plaintiffs; Psychotropic Medication Declined**

The following day, April 14, 2010, M.T.'s treating psychiatrist, Defendant Anilla Del Fabbro, M.D., spoke with LeGina Thomas by telephone, advising her that she believed M.T. to be suffering from depression and possible schizophrenia.  She also reported that M.T. was experiencing auditory and visual hallucinations.  Del Fabbro recommended that M.T. be placed on a selective serotonin reuptake inhibitor ("SSRI") to treat her depression, noting that the medication would also help with M.T.'s academic performance and behavioral issues in school.

Mrs. Thomas replied that M.T. was not suffering from poor academic performance, had not heretofore displayed any behavioral problems, and was in the gifted program in her public school.  She noted that M.T. had not experienced hallucinations prior to the incident with her friend's brother, indicated that she would research the recommended SSRI, and expressed a desire to explore alternative treatment options before resorting to medication.  In the meantime, Mrs. Thomas refused her permission to dispense any psychotropic medication to M.T.

Two days later, on April 16, 2010, Dr. Del Fabbro again telephoned Mrs. Thomas to request her permission to treat M.T. with an SSRI, noting that M.T. had reported that she had been suffering from hallucinations "for years."  *Id.* ¶ 26.  Mrs. Thomas again refused her permission, reiterating her position that M.T. was being dishonest with her treating physicians.  Mrs. Thomas further stated that she had researched SSRIs on the internet and was wary of the warning labels (which, *inter alia,* note that use of SSRIs can sometimes *increase* suicidal

3

thoughts and behavior in young people) from the Food and Drug Administration that appeared on the medication.  Mrs. Thomas further faxed Dr. Del Fabbro several documents from M.T.'s school supporting her position that M.T. did not have a history of behavioral difficulties.

After the conclusion of the call, a UNMCPC nurse also telephoned Mrs. Thomas and again advised her about the ways SSRI medication can be helpful.

In light of Mrs. Thomas' continued refusal to allow M.T. to be treated with psychotropic medication, Defendants determined that M.T. should go to a residential treatment facility upon her release from UNMCPC, rather than return to her parents' home.  Plaintiffs initially agreed to consider such a plan, but after hearing reports of Defendants' medical conclusions regarding M.T., came to distrust their recommendations.

**Kaven Diagnoses M.T. With Depression, Schizophrenia, Borderline Personality Traits, and Mental Retardation**

On April 20, 2010, Defendant Mary Kaven, Ph.D., performed a psychological evalutation of M.T.

The following day, April 21, 2010, Mrs. Thomas advised Defendants by telephone that Plaintiffs would not be able to review Kaven's evaluation in person with M.T. and her treatment team, because of financial and child-care concerns and other scheduling conflicts.  Mrs. Thomas asked to review a copy of the evaluation by other means, but was advised by M.T.'s therapist, Defendant Jill Straits,[2] that she could only receive the complete evaluation if she came to the facility in person.  However, Straits did disclose that M.T. had been diagnosed with major depressive disorder, borderline personality disorder, and early-onset schizophrenia.  Straits later

---

[2]Ms. Straits is incorrectly identified as "Jill Strait" in the caption and at various places in the Complaint.

4

clarified in a separate conversation that M.T. had been diagnosed with borderline personality traits, rather than full-blown borderline personality disorder.

The Complaint recites that Straits further indicated that her doctors believed that M.T. may suffer from mental retardation and that, "because she had been diagnosed with petite mal seizures when she was a toddler, they were concerned that the suspected mental retardation, petite mal seizures, and schizophrenia may somehow combine and result in M.T. never returning to reality." *Id.* ¶ 34. Mrs. Thomas replied that M.T. was classified as "gifted" by her public school and had not had a seizure since she was a toddler.

The summation of the doctors' diagnoses caused LeGina Thomas "to lose faith in M.T.'s team's assessment of her daughter." *Id.* ¶ 38.

**Plaintiffs Continue to Refuse Consent to Administer SSRIs and Antipyschotic Drugs to M.T.**

On April 26, 2010, Dr. Del Fabbro telephoned LeGina Thomas to re-iterate her recommendation that M.T. be administered SSRIs. Del Fabbro also informed Mrs. Thomas of her additional recommendation that M.T. be treated with antipsychotic medication and melatonin supplements. Mrs. Thomas again rejected these recommendations and requested that Del Fabbro fax Plaintiffs a copy of M.T.'s evaluation summary. However, Dr. Del Fabbro told her that M.T.'s psychological evaluation summary would only be provided to her if she appeared at UNMCPC in person.

**Straits Reports Plaintiffs to CYFD For Medical Neglect**

On April 27, 2010, Straits contacted CYFD to express her concerns about Plaintiffs' apparent disregard of doctor recommendations and refusal to administer psychotropic drugs to M.T. The next day, April 28, 2010, Straits and LeGina Thomas spoke by telephone, and Mrs.

Thomas agreed to come to UNMCPC to meet with M.T.'s treating physicians. Mrs. Thomas promised to listen to the physicians' recommendations with an open mind, but expressed her inclination to sign M.T. out of the facility against medical advice.

Following this conversation, Straits again contacted CYFD, this time to report Plaintiffs' alleged medical neglect of M.T. Plaintiffs allege that Straits further ordered unidentified hospital staff members to monitor M.T.'s calls with her parents.

**Defendants Place M.T. on Five-Day Medical Hold**

On April 29, 2010, LeGina Thomas traveled from Lovington, NM to UNMCPC in Albuquerque, for the purpose of meeting with Defendants to discuss M.T.'s psychological evaluation. Dr. Kaven informed Mrs. Thomas that M.T.'s diagnosis was major depressive disorder with psychosis, borderline traits, and post-traumatic stress. She further noted that Plaintiffs' medical insurance "was very good because it was willing to pay for anything and everything that other insurance companies would not cover," which had prompted Defendants to put M.T. on a waiting list for a residential treatment facility without seeking Plaintiffs' prior authorization. *Id*. ¶ 46.

For her part, Mrs. Thomas replied that she did not believe M.T. was suicidal or experiencing hallucinations, and again declined to authorize the administration of psychotropic medication to M.T. Dr. Del Fabbro then informed Mrs. Thomas that Defendants were taking emergency medical custody of M.T., because Del Fabbro did not believe she was competent to make medical decisions on her behalf. Del Fabbro then placed M.T. on a five-day medical hold, so that Mrs. Thomas was not allowed to obtain her release from UNMCPC that day.

**Del Fabbro Reports Plaintiffs to CYFD For Medical Neglect, Defendants File Involuntary Commitment Petition in State Court**

On April 30, 2010, Del Fabbro telephoned CYFD and alleged that Plaintiffs committed medical neglect by failing to authorize the appropriate administration of psychotropic medication to M.T. to treat her purported psychosis.  Less than a week later, on May 4, 2010, Defendants filed an involuntary commitment petition seeking to confine M.T. at UNMCPC for a period not to exceed sixty days.

UNMCPC issued a notice to Plaintiffs that a hearing would be held on Defendants' petition in the Bernalillo County Second Judicial District Court on May 10, 2010.

**Involuntary Commitment Petition Abandoned and M.T. Released**

On or about May 5, 2010, UNMCPC received notice from Plaintiffs' insurance carrier that it would not cover the costs of M.T.'s hospitalization any longer.  Straits telephoned LeGina Thomas and informed her that she should pick up her daughter "immediately."  *Id.* ¶ 55.  Where Defendants had previously represented that Plaintiffs were unable to make competent decisions about M.T.'s care, they "[s]uddenly . . . felt that there was an adequate safety plan in place to prevent imminent harm to M.T."  *Id.*

The following day, May 6, 2010, Mrs. Thomas picked up M.T. from the hospital and took her home.

**Kaven Reports Plaintiffs to CYFD For Medical Neglect**

On May 7, 2010, despite Defendants' discharging M.T. and abandoning their petition for involuntary commitment, Plaintiffs claim that Kaven once again reported Plaintiffs to CYFD for medical neglect, "because Plaintiffs did not believe she was suicidal or experiencing auditory and visual hallucinations and they refused to authorize the administration of psychotropic drugs."  *Id.* ¶ 57.

Since her release from the hospital in May 2010, M.T. has performed well in school and

has not demonstrated any symptoms of mental illness.

## LEGAL STANDARD

*Rule 12(b)(6)*

Rule 12(b)(6) provides in relevant part that "failure to state a claim upon which relief can be granted" is a defense to a claim for relief in any pleading. A court may dismiss a cause of action under Rule 12(b)(6) for failure to state a claim only if it appears beyond a doubt that a plaintiff can prove no set of facts in support of the claim that would entitle him or her to relief. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811 (1993). A motion to dismiss should be granted if, viewing the well-pleaded factual allegations of the complaint as true, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). Thus, in considering a Rule 12(b)(6) motion, a court must assume all well pleaded facts, but not conclusory allegations, to be true, and must draw all reasonable inferences in favor of a plaintiff. *See Housing Auth. of the Kaw Tribe v. City of Ponca,* 952 F.2d 1183, 1187 (10th Cir. 1991); *Maher v. Durango Metals, Inc.*,144 F.3d 1302, 1304 (10th Cir. 1998). The issue in reviewing the sufficiency of a complaint is not whether a plaintiff will prevail ultimately, but whether a plaintiff is entitled to offer evidence to support his or her claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). However, the rules do not require a court to accept legal conclusions or unwarranted inferences. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (citation omitted).

### *Qualified Immunity in the Context of a 12(b)(6) Motion to Dismiss*

"When a defendant raises qualified immunity in a Rule 12(b)(6) motion to dismiss, 'the plaintiff must carry the burden of establishing that the defendant violated clearly established law.'" *Johnson v. Bd. of Curry County Commissioners*, 2007 U.S. Dist. LEXIS 96214, (D.N.M., Nov. 18, 2007), quoting *Lybrook v. Members of Farmington Mun. Schools Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). The nature of the qualified immunity inquiry imposes a "heavy two-part burden" on the plaintiff. In order to defeat the qualified immunity defense, the plaintiff must both "demonstrate that the defendant's actions *violated* a constitutional or statutory right" and "show that the constitutional or statutory rights the defendant allegedly violated were *clearly established* at the time of the conduct at issue." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (emphasis added). Federal judges are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). For a right to be clearly established under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quotation omitted). "A plaintiff can demonstrate that a constitutional right is clearly established by references to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008)

If the plaintiff fails to show that a defendant's conduct violated a constitutional or statutory right, the court need not reach the additional question of whether the law was clearly established at the time of the challenged conduct. *Butler v. Rio Rancho Pub. Schs. Bd. of Educ.*, 341 F.3d 1197, 1200 (10th Cir. 2003).

**DISCUSSION**

Both of Plaintiffs' remaining claims arise under the Due Process Clause of the Fourteenth Amendment. First, Plaintiffs claim that Defendants violated their right to direct the care and upbringing of their child, M.T., "when they accused Plaintiffs of medical neglect for questioning their diagnoses and refusing to authorize the administration of psychotropic medication to M.T." *Id.* ¶ 64. Second, Plaintiffs claim that Defendants violated their right to familial association by placing M.T. on a five-day medical hold at UNMCPC and filing an involuntary commitment petition regarding her future care. In support of the instant motion, Defendants argue that they are entitled to qualified immunity and/or absolute immunity on both Plaintiffs' claims.[3]

**I. Plaintiffs' Substantive Due Process Right to Direct M.T.'s Medical Care**

Because Defendants assert qualified immunity, Plaintiffs carry the "heavy two-part burden" of demonstrating that (1) under the facts of this case, Defendants' reporting Plaintiffs to CYFD for medical neglect violated Plaintiffs' Fourteenth Amendment right to direct the care and upbringing of their child, and (2) that this right was clearly established at the time of the conduct at issue. *See Archuleta,* 523 F.3d at 1283. Plaintiffs do not attempt to meet this burden. Rather, Plaintiffs describe as "binding precedent" a number of cases, factually dissimilar from this one, that generally refer to "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (Doc. 15 at 13) (quoting *Troxel v. Granville*, 530 U.S.

---

[3]While Defendants suggest that they are entitled to absolute immunity on both of the instant claims (*see* Doc. 11 at 4), they do not attempt to show how making accusations of medical neglect to a child-welfare agency – the conduct complained of in Plaintiffs' "right to direct the care and upbringing of a child" claim – comes within the scope of absolute immunity protection. Accordingly, the Court will only consider whether Defendants are entitled to qualified immunity on their "right to direct" claim.

57, 66 (2000) (fit custodial parent had fundamental right to restrict grandparent visitation); *see also Meyer v. Nebraska*, 262 U.S. 390 (1923) (parents had fundamental right to direct education of children by engaging foreign-language teacher); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925) (statute requiring "normal" children to attend public schools interfered with fundamental interest of parents in directing education); *Bellotti v. Baird*, 443 U.S. 622, 638 (1979) (state could not lawfully authorize an absolute parental veto over the decision of a minor to terminate her pregnancy); *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1203 (10th Cir. 2003) (district court erred in dismissing due process claim that school's performing routine physical exam on students without obtaining prior consent of parents violated parents' right to direct children's upbringing). The Court disagrees with Plaintiffs' premise that, because these cases identify a fundamental right of parents to make decisions regarding the upbringing of their children, they somehow demonstrate that such a right was violated under the circumstances of this case.

The remainder of Plaintiffs' argument is devoted to a four-page overview of *PJ ex rel. Jensen v. Wagner,* 603 F.3d 1182, 1198 (10th Cir. 2010), which Plaintiffs attempt to distinguish from this case. In *Jensen*, the Tenth Circuit held that parents' right to direct their cancer-stricken son's medical care – which the parents claimed was violated when their refusal to allow the boy to receive potentially life-saving chemotherapy culminated in the institution of proceedings against them – if it existed in those circumstances, was not clearly established at the time it was allegedly violated. The court noted that it had "never specifically recognized or defined the scope of a parent's right to direct her child's medical care," but that the Supreme Court "has long recognized . . . that parental rights, including any right to direct a child's medical care, are not absolute." *Id.* at 1197-98 (citations omitted). Thus, because the summary judgment record showed that seven qualified physicians recommended immediate chemotherapy to save the boy's

11

life and, moreover, because "when a child's life is under immediate threat, a state's interest in protecting the child is at its zenith," *id.* at 1198, the court in *Jensen* concluded that, under the facts in issue, the parents did not have a clearly-established Fourteenth Amendment right to refuse treatment for their son.

The Court finds *Jensen* instructive for two reasons. First, the case recognizes, as Plaintiffs seemingly do not, that a parent's fundamental right to direct the care and upbringing of her child is not without limitation. Consequently, Plaintiffs cannot overcome Defendants' claims of qualified immunity by simply citing case law acknowledging that such a right exists. Moreover, even if Plaintiffs *had* attempted to show that they had a right to refuse to allow UNMCPC staff to treat M.T. with psychotropic medication – after M.T. confessed to suicidal thoughts and several past suicide attempts, and treating physicians diagnosed her with depression, schizophrenia, and borderline personality traits – the Tenth Circuit's holding in *Jensen* serves as compelling counter-authority indicating that state actors may intervene where the child's immediate safety is at stake. *See id.* ("Parents cannot always have absolute and unreviewable discretion to decide whether to seek such care for their children, but they retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment") (quotation and brackets omitted); *see also Parham v. J.R.,* 442 U.S., 584, 603 (1979) ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.").

Accordingly, the Court finds that Plaintiffs fail to meet their burden of showing that their asserted right to direct M.T.'s medical care was clearly established at the time of the alleged violations. Therefore, the Court finds that Defendants are entitled to qualified immunity on the

instant claim.

## II.  Plaintiffs' Substantive Due Process Right to Familial Association

"Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life."  *Roberts v. U.S. Jaycees,* 468 U.S. 609, 619-20 (1984); *see also Trujillo v. Bd. of County Comm'rs*, 768 F.2d 1186, 1189 (10th Cir. 1985) (parental relationship is a constitutionally protected liberty interest).  The Tenth Circuit applies a balancing test to determine whether a plaintiff's Fourteenth Amendment right to familial association has been infringed.  *Lowery v. County of Riley,* 522 F.3d 1086, 1092 (10th Cir. 2008). Specifically, the court balances "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id*.  The Tenth Circuit further directs that "an allegation of *intent* to interfere with a particular relationship protected by the freedom of familial association is required to state a claim under section 1983." *Trujillo,* 768 F.2d at 1190 (emphasis added). Consequently "not every statement or act that results in an interference with the rights of familial association is actionable.  The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship."  *Lowery,* 522 F.3d at 1093 (quotation omitted).

Defendants argue that they are entitled to qualified immunity on the instant claim because Plaintiffs do not demonstrate that the acts of placing M.T. on a five-day medical hold and filing and abandoning a petition for involuntary commitment violated Plaintiffs' right to familial association under the Tenth Circuit's balancing test.  In their response, Plaintiffs again fail to acknowledge that Defendants' invoking a qualified immunity defense transfers the burden

13

of showing a constitutional violation to Plaintiffs in order to survive dismissal.  Rather, Plaintiffs simply refer to the portion of the Complaint which recites how Del Fabbro "took emergency medical custody of M.T. and placed her on a five-day medical hold[,] thereby ensuring that M.T. could not leave UNMCPC and return home."  (Doc. 15 at 20).  Plaintiffs then sum up their argument by vaguely referring to the familial-association balancing test, noting in conclusory fashion that "the ostensible reasons supporting the Defendants' actions – i.e. their doubtful and dubious claims that M.T. has severe mental health issues – do not overcome [Plaintiffs'] parental rights to associate with their child."  *Id.* at 21.  Plaintiffs do not attempt to argue how Defendants' asserted reasons for placing M.T. on a five-day hold were "doubtful and dubious."  Nor do they assert, let alone demonstrate, that Defendants acted with the requisite intent to interfere with Plaintiffs' relationship with M.T.  Moreover, Plaintiffs' argument does not even mention the other basis for the instant claim asserted in the Complaint – Defendants' filing of an involuntary commitment petition in state court, which they subsequently abandoned one week later.

Accordingly, the Court finds that Plaintiffs fail to meet their burden of showing that Defendants imposed an undue burden on their relationship with M.T. and thereby violated their associational rights under the Fourteenth Amendment.  Therefore, the Court finds that Defendants are entitled to qualified immunity on the instant claim and need not reach the issue of whether Defendants are further entitled to absolute immunity, as well.

## CONCLUSION

For the foregoing reasons, it is therefore ordered that Defendants' *Motion to Dismiss Based on Defendants' Absolute Immunity and Qualified Immunity Protections* (Doc. 11) is

granted.  Plaintiffs' Complaint is therefore dismissed without prejudice.

_____
UNITED STATES DISTRICT COURT JUDGE