## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**LeGINA THOMAS,**
**TODD THOMAS,**

> **Plaintiffs,**

**v.**                                              **No. Civ. 12-381-JCH-LAM**

**Dr. MARY KAVEN, Ph.D.,**
**JILL STRAITS, and**
**Dr. ANILLA DEL FABBRO, M.D.,**
**in their individual capacities,**

> **Defendants.**

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on the Second Motion for Summary Judgment and Supporting Brief (ECF No. 77) filed by Defendants Dr. Mary Kaven, Ph.D., Jill Straits, and Dr. Anilla Del Fabbro, M.D., (collectively, "Defendants"), with regard to Plaintiffs' Fourteenth Amendment familial association claim. The Court, having considered the motion, briefs, evidence, and applicable law, concludes that Defendants' motion should be granted as to Defendants Kaven and Straits for lack of personal participation in the specific constitutional violation complained of, but the motion should be denied as to Defendant Del Fabbro.

## I.      FACTUAL BACKGROUND

On April 12, 2010, Plaintiffs reported a possible sexual assault involving their 12-year-old daughter "MT" to the Lea County Sheriff's Department ("LCSD"). Defs.' Second Mot. for

Summ. J. (hereinafter "MSJ"), Undisputed Fact ("UF") ¶ 1, ECF No. 77. During the investigation, MT told an officer that she wanted to injure herself. Aff. of LeGina Thomas ¶ 4, ECF No. 13-5. An LCSD screening officer completed a Suicide Prevention Screening Guidelines form from Nor-Lea General Hospital, recording that MT feels that there is a "threatening environment at home," MT had received prior psychiatric counseling, MT showed signs of depression, and MT did not have previous suicide attempts. *See* Defs.' Ex. A, ECF No. 77-1.

MT was evaluated at Nor-Lea General Hospital. Aff. of LeGina Thomas ¶¶ 4-5, ECF No. 13-5. On April 13, 2010, Dr. Ronald D. Hopkins from Nor-Lea Hospital requested a seven-day emergency evaluation for psychiatric hospitalization at the University of New Mexico Children's Psychiatric Center (hereinafter "UNM Hospital") for MT. *See* Pls.' Resp., UF ¶ 33, ECF No. 101. The Children, Youth, and Family Department ("CYFD") also investigated and told LeGina Thomas that if she did not agree to transfer her daughter to UNM Hospital for a mental health evaluation, CYFD would take custody of MT. Aff. of LeGina Thomas ¶ 6, ECF No. 13-5.

MT was admitted to UNM Hospital on April 13, 2010. Pls.' Resp., UF ¶ 34, ECF No. 101. At the time of MT's admission, UNM Hospital provided children with acute, inpatient mental health services. Defs.' MSJ, UF ¶ 4, ECF No. 77. In admitting her daughter on April 13, 2010, Mrs. Thomas agreed that MT would receive a mental health evaluation and participate in treatment programs based upon a determination of her individual needs. Voluntary Consent Form, ECF No. 44-2. The Voluntary Consent form notified Mrs. Thomas that she had the right to request an immediate discharge of her child from the treatment program at any time, but if she did and if a licensed psychologist or director of the residential treatment program determined that her child needed continued treatment, on the first business day following the discharge request, the children's court attorney or district attorney may begin involuntary commitment proceedings.

2

*Id.* By signing the form, Mrs. Thomas acknowledged that she understood that, if involuntary commitment proceedings were filed, her child had a right to a court hearing within seven days after the request for discharge. *Id.* At the time of her admission, MT's estimated length of stay was 3-5 days. Pl.'s Ex. 4 00167, ECF No. 102-7.

Dr. Anilla Del Fabbro is a medical doctor licensed in the State of New Mexico and was MT's treating psychiatrist during the time MT was at UNM Hospital. Defs.' MSJ, UF ¶ 9, ECF No. 77. Dr. Del Fabbro knew that CYFD wanted a psychiatric evaluation of MT. Pls.' Resp., UF ¶ 54, ECF No. 101.

UNM Hospital follows a "medical model" for treatment in which Dr. Del Fabbro was the attending physician who held the authority for patient treatment, diagnosis, prescribing medications, and authority over the patient's release. *Id.* UF ¶ 8. During MT's stay at UNM Hospital, Mary Kaven, PhD., was a licensed clinical psychologist, and Jill Straits was an intern and therapist in the UNM psychology department. *Id.* UF ¶¶ 10-11; Dep. of Dr. Kaven 28:3-5, ECF No. 102-4.[1] Ms. Straits was not at the time licensed. Dep. of Dr. Kaven 29:13-19, ECF No. 102-4. Dr. Kaven was Ms. Straits' clinical supervisor and was responsible for Ms. Straits' interventions and work. Dep. of Dr. Kaven 28:3-5, ECF No. 102-4, and 78:6-7, ECF No. 102-5. They were part of MT's treatment team and attended meetings where there was verbal input and discussion among team members. *See id.* 29:13-19, ECF No. 102-4. Ms. Straits' role on MT's treatment team was to provide therapy intervention. Dep. of Jill Straits 10:4-6, ECF No. 102-6. UNM Hospital also assigned a case manager to MT who, after Dr. Del Fabbro made treatment decisions, would follow through on availability of treatments and make appointments as needed.

---

[1] Jill Straits is now Dr. Straits, but the Court will refer to her as Ms. Straits because at the time of the incident, she did not have that title.

*See* Dep. of Dr. Kaven 15:7-21, ECF No. 102-4. Prior to April 14, 2010, Dr. Del Fabbro had never seen or treated MT, nor had any of the Defendants had any prior contact with MT, her parents, CYFD, Nor-Lea General Hospital, or LCSD regarding MT. Defs.' MSJ, UF ¶ 7, ECF No. 77.

During her intake at UNM Hospital, MT underwent a physical evaluation that revealed scarring on her thighs and wrists, which MT attributed to her history of cutting and self-mutilation. *Id.*, UF ¶ 12. MT's medical report indicates that Mrs. Thomas reported at some point that one of the scars on MT's arm was from opening a box with a knife that slipped and cut her, which was why Mrs. Thomas did not believe MT was telling the truth about cutting. *See* Pls.' Ex. 4 at 00206, ECF No. 102-7.

On April 14, 2010, Dr. Del Fabbro performed an evaluation of MT. *Id.* UF ¶ 13. From information attained through MT's admission history and the course of the assessment, Dr. Del Fabbro understood that MT had reported the following: she had suicidal thoughts, her parents butt in too much, she attempted suicide twice in the past, she had a history of cutting and self-mutilation, she did not feel safe going home, she was going to kill herself, and there were guns in the home that were not locked up. *See* Defs.' Ex. F 000008-09, ECF No. 77-6; Behavioral Health Notes 239, ECF No. 13-6. Mrs. Thomas reported that the guns were locked up. *See id.*

That same day, on April 14, 2010, Dr. Del Fabbro first recommended to Mrs. Thomas that MT take a selective serotonin reuptake inhibitor ("SSRI"), a psychotropic medication, to treat MT's depression, despite that the psychological evaluation had not yet been administered. *See* Dep. of Dr. Del Fabbro 70:15-20, ECF No. 102-1; Aff. of LeGina Thomas ¶¶ 9-10, ECF No. 13-5; Pls.' Ex. 4 at 00228, ECF No. 102-8. Dr. Del Fabbro advised Mrs. Thomas that she believed MT was depressed, likely schizophrenic, and experiencing visual and auditory

hallucinations. Aff. of LeGina Thomas ¶¶ 9-10, ECF No. 13-5. Dr. Del Fabbro's assessment that MT was experiencing hallucinations was solely based on MT's reports to her and other staff. Dep. of Dr. Del Fabbro 64:1-65:5, ECF No. 102-1. Mrs. Thomas was alarmed by MT's suicidal ideations, but also thought she may have been stating she was suicidal to avoid repercussions for what may have been her sexually inappropriate activity, and she repeatedly advised UNM Hospital staff of that possibility. Aff. of LeGina Thomas ¶¶ 8, 12, ECF No. 13-5.

Dr. Del Fabbro explained that the SSRI would help with MT's poor grades and behavioral issues at school, but Mrs. Thomas responded that MT did not have any behavioral issues and was doing well in school. *Id.* ¶¶ 10-11. Mrs. Thomas reiterated that MT had not reported any hallucinations until confronted about the sexual incident, and she stated that did not give permission to administer SSRIs and wanted to explore other treatment options, including counseling before resorting to psychotropic medication. *Id.* ¶¶ 12-13. Dr. Del Fabbro was troubled by Mrs. Thomas not being open to discussion about the administration of SSRIs to MT. *See* Dep. of Dr. Del Fabbro 74:13-75:14, ECF No. 102-1; Pls.' Ex. 4 at 00207, 00221, 00228, ECF No. 102-7; Defs.' Ex. F 000011, ECF No. 77-6. Dr. Del Fabbro nonetheless viewed Mrs. Thomas as a caring mother and believed that she was concerned about MT's suicidal ideation. Dep. of Dr. Del Fabbro 85:24-86:8, ECF No. 102-1.

On or about April 14, 2010, Mrs. Thomas told Ms. Straits that she was refusing all medications for MT for three main reasons: studies on antidepressants concluding an increase in risk for suicidality, patient's history of being a "hypochondriac," and her own belief that therapy or other avenues of treatment should be tried first. *See* Pls.' Ex. 4 at 00221, ECF No. 102-8.

On April 16, 2010, Dr. Del Fabbro called Mrs. Thomas to express her concern that MT reported experiencing visual and auditory hallucinations for years and to recommend MT start taking SSRIs. Aff. of LeGina Thomas ¶ 15, ECF No. 13-5. Mrs. Thomas again refused, because her research of SSRIs on the internet revealed they carry a black box warning from the Food and Drug Administration and are known to increase suicidal thoughts and behaviors in children and adolescents. *See id.* ¶¶ 14-16. Mrs. Thomas explained her reasons for the refusal, including her concerns about the black box warnings and malingering. *See id.* ¶ 16. Mrs. Thomas stated that if she were to become confident in the diagnoses and other less drastic treatment options were exhausted, she would consider authorizing psychotropic medication. *Id.* Dr. Del Fabbro was aware of the black box warning about an increase in suicidal ideation for individuals as young as MT. *See* Dep. of Dr. Del Fabbro 96:17-24, ECF No. 102-2.

Dr. Del Fabbro ordered psychological testing of MT, and Dr. Kaven and Ms. Straits performed the psychological assessment. *See* Dep. of Dr. Kaven 29:13-19, ECF No. 102-4. Dr. Kaven interviewed MT twice as part of the psychological evaluation, and those two times were the only times she spoke to MT. *Id.* 47:10-22. Afterwards, Dr. Del Fabbro's role was to review the assessment. *See* Dep. of Dr. Del Fabbro 25:7-17, ECF No. 102-1.

On April 21, 2010, Ms. Straits told Mrs. Thomas that MT might be mentally retarded. Aff. of LeGina Thomas ¶ 17, ECF No. 13-5. Mrs. Thomas replied that she was surprised because MT had been in gifted classes. *Id.* ¶ 18. Indeed, Dr. Kaven had not conducted intellectual or achievement testing because it was clear MT was very smart. Dep. of Dr. Kaven 87:16-22, ECF No. 102-5. Mrs. Thomas also reported to Dr. Del Fabbro that MT was gifted and received A's and B's in school. Dep. of Dr. Del Fabbro 77:17-20, 81: 19-24, ECF No. 102-1.

On April 27, 2010, Ms. Straits spoke to a CYFD investigator to give an update on her concerns regarding MT's parents and reported that they did not believe she was actually suicidal, disagreed with professional recommendations, would not consider any medications despite psychiatrist's recommendations, and might not, despite their initial agreement, follow through with RTC placement. *See* Dep. of Dr. Kaven 98:20-99:11, ECF No. 102-5; Pl.'s Ex. 4 at 00211, ECF No. 102-8.

Between her April 13, 2010 admission and April 28, 2010, MT remained in treatment at UNM Hospital. Defs.' MSJ, UF ¶ 15, ECF No. 77. At some point during MT's stay, Mrs. Thomas told the hospital staff that she would consider placing MT in a residential treatment facility. *See* Pls.' Resp., UF ¶ 63, ECF No. 101.

On April 28, 2010, Mrs. Thomas advised UNM Hospital that she intended to remove MT from the facility against the staff's medical advice. *See* Defs.' MSJ, UF ¶ 16, ECF No. 77. An April 28, 2010 therapy note in MT's medical chart from UNM Hospital stated:

> Patient reported that, if she were to go home, [the scale of her suicidal ideation] would be at an 8 and she was at a 10 as far as likelihood of hurting herself: "I would grab a knife, grab a razor, and I would hurt myself." Patient stated that she was at a 5 or 6 for wanting to kill herself if she went home, stating "I'm ready to give up my life." She denied having a plan, stating that "when I get into that moment, the thoughts come to me and that's what I would do." . . . When asked about her feeling of being "dead," patient reported that it was at a 6 right now, and if she were with her parents it would be at a 10 still.

*Id.*, UF ¶ 18.

Dr. Kaven, however, stated in her medical notes for April 29, 2010, that MT reported that her mother told her the prior night that she was going home; MT said she was happy and denied suicidality; MT said her mother had told her she set up an appointment with a doctor and a

therapist, MT would be home schooled, and they were going to go to family therapy; and MT was smiling and appeared excited. Pls.' Resp., UF ¶¶ 68, 87, ECF No. 101.

On April 29, 2010, Mrs. Thomas met in person with Dr. Del Fabbro, Dr. Kaven, and Ms. Straits to discuss the results of MT's psychological testing. Aff. of LeGina Thomas ¶ 21, ECF No. 13-5; Dep. of Dr. Kaven 71:3-23, ECF No. 102-5. During the meeting, Mrs. Thomas continued to express her beliefs that her daughter was lying about suicidal ideation and hallucinations to avoid punishment and that she was uncomfortable with medications. Dep. of Dr. Kaven 72:7-19, ECF No. 102-5. Mrs. Thomas told Dr. Del Fabbro that she had made arrangements for outpatient services for MT in Lovington, New Mexico. *See* Pls.' Resp., UF ¶¶ 67, 91, ECF No. 101. Dr. Kaven reported that day that Mrs. Thomas cared about her daughter, was concerned for her well-being, and was trying very hard to make decisions that she believed to be in MT's best interest. *See* Pls.' Ex. 4 at 00207, ECF No. 102-7. Dr. Kaven wrote that Mrs. Thomas also appeared to understand what treatment team members were saying, but lacked openness to professional advice and placed more trust in the advice of online forums and in her own ability to assess MT's psychiatric symptoms and risk for self-harm. *See id.* Dr. Del Fabbro nevertheless told Mrs. Thomas that she was taking emergency medical custody of MT because she did not believe Mrs. Thomas was competent to make medical decisions on her behalf and she had continued discomfort with discharge to regular outpatient services at the time due to MT's mental status. *See* Aff. of LeGina Thomas ¶ 23, ECF No. 13-5; Pls.' UF ¶ 91, ECF No. 101.

On April 29, 2010, Dr. Del Fabbro placed an involuntary medical hold on MT, asserting that she did so for the safety of MT based on MT's statement that she was going to kill herself if she were to go home. *See* Aff. of Anilla Del Fabbro, M.D., ¶¶ 17-21, ECF No. 44-1; Dep. of Dr. Del Fabbro 38:20-24, ECF No. 77-2. In making her decision, Dr. Del Fabbro relied on input

from various sources, including her assessment of MT and family dynamics, MT's history, her assessment of other people who interacted with MT and other professionals involved in her care, and her knowledge that a child who has self-harm or cutting behavior is at very high risk for suicidality. *See* Dep. of Dr. Del Fabbro 46:5-47:7, ECF No. 77-2 and 45:5-25, ECF No. 102-1. Dr. Del Fabbro did not rely on MT's psychological evaluation. *See* Dep. of Dr. Del Fabbro 45:17-25, ECF No. 102-1. Dr. Del Fabbro's stated reasons for placing the medical hold on MT were that MT said she was suicidal; she had a diagnosis of depression, a diagnosis which her auditory and visual hallucinations supported; there were guns in the home; MT stated she would kill herself by any means possible; there was discord at home; a child who is using self-harm is a predictor of subsequent suicidal ideation or following through with a plan; there was no outpatient provider in place; and Mrs. Thomas was not open at the time to discussing and dismissive of MT's suicidal ideation and other symptoms. *See id.* 67:8-68:24.

Dr. Del Fabbro knew that MT had seen a counselor in the past, but never contacted MT's counselor and did not know whether MT saw the counselor for depression. *See* Dep. of Dr. Del Fabbro 76:15-77:11, 80:10-24, 112:3-21, ECF Nos. 102-1 to 102-2. Dr. Del Fabbro understood that MT was not seeing a counselor just prior to her admission. *Id.* 112:3-6, ECF No. 102-2. Dr. Del Fabbro concluded MT had a history of depression based on MT's reports that she had been depressed after her adoption by her stepdad, that it is common in children for a change to lead to anxiety or depression, and that there had been a need for counseling. *See id.* 76:15-77:11, 112:3-21, ECF Nos. 102-1 to 102-2. Dr. Del Fabbro agreed with the diagnosis for MT of major depressive order, but did not agree with any diagnosis of early onset schizophrenia, borderline personality disorder, or mental retardation. Pls.' Resp., UF ¶ 64, ECF No. 101. Borderline personality disorder is not an appropriate diagnosis for children under age 13. *Id.*

9

At 11:19 a.m., Dr. Del Fabbro changed MT's status on her electronic medical charge from "Voluntary" to "5-Day Hold." Defs.' Ex. G, ECF No. 77-7. At the time, a New Mexico statute was in effect that permitted the involuntary placement of a child to residential care on an emergency basis when the person seeking the placement "believes that the child is likely to cause serious bodily harm to self or to others during the period that would be required to hold an involuntary placement hearing." N.M. Stat. Ann. § 32A-6A-22(N). It was Dr. Del Fabbro's decision to place the medical hold on MT. Aff. of Dr. Del Fabbro ¶ 19, ECF No. 44-1. Dr. Kaven and Dr. Straits did not make the decision to place a medical hold on MT on April 29, 2010, they did not place the medical hold on MT, and they did not discuss with Dr. Del Fabbro the decision to place the medical hold. Defs.' MSJ, UF ¶¶ 24-25, ECF No. 77.

UNM Hospital provides security for its patients, and while MT was there she lacked access to weapons and instruments for self-harm. Defs.' MSJ, UF ¶ 27, ECF No. 77. UNM Hospital personnel monitored and observed MT during her stay. *See id.* Nevertheless, during the time period she was on the medical hold, MT reported that a peer hit her. *See* Pls.' Ex. 4 at 00232, ECF No. 102-8.

On April 30, 2010, Ms. Straits called CYFD and reported that Mrs. Thomas came to discharge MT against medical advice, minimized and denied MT's symptoms, and refused to consider medications to treat her symptoms of psychosis. Pls.' Resp., UF ¶ 71, ECF No. 101. On May 3, 2010, MT reported that she would be dead within two weeks if she had to go home. *Id.*, UF ¶ 72.[2] On May 4, 2010, MT reported that "these are the worst [suicidal ideations] I have had since prior to admission; I am fit to bust." Pls.' Resp., UF ¶ 73, ECF No. 101.

---

[2] The cited portion of the record does not exactly state what Plaintiff asserts, but because Defendants did not challenge the fact, the Court will accept it as undisputed for purposes of the motion. *See* Pls.' Ex. 4 at 00203, ECF

Ms. Straits filed a petition for MT's involuntary commitment on May 4, 2010 ("Petition"). *Id.*, UF ¶ 74. Dr. Del Fabbro reviewed the Petition prior to it being filed. *Id.* The Petition stated that MT suffers from a mental disorder diagnosed as major depressive disorder, recurrent severe with psychotic features, PTSD, borderline traits. Pls.' Ex. 4 at 00396, ECF No. 102-8. The Petition listed MT's symptoms as statements of hopelessness; "I'm ready to die;" depression and suicidality; history of cutting; complains she does not feel alive; reports of auditory and visual hallucinations of screaming, people dying around her, seeing a little girl when she feels like cutting; feeling as if her parents and friends control her; fragile sense of identity; stated she would kill herself if she returned home; and dissociative symptoms. *Id.* The Petition additionally stated that the petitioners "Considered TFC—not covered by insurance. Will not consider [outpatient] therapy given severity of presenting symptoms, patient's consistent statements of suicidality with a vague plan (razor knife), emotional impulsivity. [MT] also requested an RTC placement repeatedly." Pls.' Resp., UF ¶ 75, ECF No. 101; Dep. of Dr. Del Fabbro 161:1-162:21, ECF No. 102-3. At the time of the completion of the Petition, the hospital staff would not consider outpatient therapy for MT because of the severity of her presenting symptoms. Pls.' Resp., UF ¶ 76, ECF No. 101.

On May 5, 2010, UNM Hospital received notice from Plaintiffs' insurance carrier that MT's stay would no longer be covered. *See* Dep. of Dr. Del Fabbro 146:24-147:5, ECF No. 102-2. That same day, Ms. Straits called Mrs. Thomas to inform her that she needed to pick up MT immediately because insurance was no longer paying for MT's treatment at UNM Hospital. *See* Aff. of LeGina Thomas ¶ 24, ECF No. 13-5. On the evening of May 5, 2010, Ms. Straits reported

---

No. 102-8 (stating that patient reported, "I'd rather go to RTC because if I go home, it will be good for a week and then I'll want to kill myself again" and listing April 30, 2010 as date of service).

that she talked with MT about having a family session to establish a safety plan and called Mrs. Thomas to request a family session for Thursday or Friday to develop a safety plan. Pls.' Resp., UF ¶ 77, ECF No. 101. Ms. Straits called Mrs. Thomas on or about May 6, 2010, to tell her that insurance would not cover Friday and she possibly could still come get MT on Thursday for immediate discharge. *See* Pls.' Ex. 4 at 00198, ECF No. 102-7.[3]

Dr. Del Fabbro released the medical hold on May 6, 2010 at 7:20 p.m. prior to any court proceedings regarding the Petition. *See* Pls.' Resp., UF ¶ 81, ECF No. 101. Dr. Del Fabbro reported on MT's discharge paperwork that, after the hold, Mrs. Thomas had talked to her husband and was more open to working on a safety plan with the therapist and that MT was discharged home with outpatient services. *See* Defs.' Ex. B 188:22-189:18, ECF No. 77-2; Defs.' Ex. H, ECF No. 77-8. Dr. Del Fabbro believed going home was an appropriate option for MT at the time of her discharge and was not concerned about MT's safety because Mrs. Thomas had described several ways they were going to address safety, such as locking away all guns, knives, and medications; MT was going to keep a journal that mom would check; MT was going to start seeing a therapist that she could reach out to if she was having suicidal thoughts. *See* Dep. of Del Fabbro 111:2-7, 115:5-25, ECF No. 102-2. Dr. Del Fabbro did not have first-hand knowledge where the guns were kept either before her admission or at the time of her discharge. Pls.' Resp., UF ¶ 65, ECF No. 101.

---

[3] Defendants argue that Plaintiffs have not shown with admissible evidence that their insurance company ever denied coverage for MT's stay beyond May 6, 2010, or threatened to do so, and attached medical records showing that Plaintiffs' insurer provided coverage through May 6, 2010. Defs.' Reply 11-12, ECF No. 103, and Defs.' Ex. A, ECF No. 103-1. The Court finds that Plaintiffs provided admissible evidence through Mrs. Thomas' Affidavit, Dr. Del Fabbro's deposition, and MT's medical records demonstrating, when inferences are construed in their favor, that UNM Hospital and Ms. Straits were informed that Plaintiffs' insurer would not provide continued coverage for MT's continued involuntary commitment and that Ms. Straits told Mrs. Thomas that her insurance would not cover MT's stay and that she needed to pick up MT. The Court finds that Plaintiffs' evidence creates a factual dispute as to whether the medical team released the medical hold, not because MT's medical condition improved, but because they believed her insurer might not cover her involuntary commitment after May 6, 2010.

After MT was discharged, Ms. Straits reported Plaintiffs had engaged in abuse and neglect by refusing to consider medications and refusing face-to-face appointments until the discharge and mentioned Dr. Del Fabbro's medical hold as support for the report. *Id.* ¶ 84. Dr. Kaven completed an Incident Report after MT's discharge and submitted it to the New Mexico Department of Health, claiming that MT had been subjected to neglect because the parents stated MT was lying and her suicidal ideation and auditory/visual hallucinations were for attention only, parents refused treatment with medication, and mother discharged MT against medical advice. *Id.* ¶ 85.

Dr. Samuel Roll, Ph.D., licensed by the New Mexico Board of Psychological Examiners in Clinical Psychology, conducted an analytic review of MT's testing data. *See* Aff. of Samuel Roll ¶¶ 3-7, ECF No. 102-9. He did not conduct his own in-person evaluation of MT, but his review included the psychological test data and evaluation, the depositions of Dr. Kaven and Ms. Straits, and MT's medical records. *See id.* ¶¶ 6-7. Dr. Roll opines that the psychological test data, as a whole, does not support the diagnosis of major depressive disorder, schizophrenia, or clinical suicidal potential. *Id.* ¶¶ 8(A)-(C). He further concludes that the psychological test data, taken as a whole, are inconsistent with forced hospitalization, admission to a residential treatment center, or forced medication. *Id.* ¶ 8(D). Dr. Roll acknowledged that in the M-PACI, a self-reporting measure, MT endorsed a large number of items consistent with depression, but that, based on a validity measure in the report and MT's Rorschach test results, including scores in the Depression Index in the normal range, he believed the results as a whole were inconsistent with depression. *See id.* ¶ 8(A). In concluding that MT's test results did not support forced hospitalization, he relied in part on Dr. Kaven's statement in the M-PACI Interpretative Report that "Supportive therapy will be the best initial vehicle for treating this child." *Id.* ¶ 8(D). Dr. Roll also relied on the following direct quotations of the test results made by Dr. Kaven:

a.  This person appears to have sufficient psychological resources to cope adequately with the demands being imposed on her by internal and external events in her life. As a consequence, she can ordinarily manage the stresses in her life without becoming unduly upset by them and is likely to be relatively free from overt anxiety, tension, nervousness, and irritability.

b.  The client displays adaptive capacity to think logically and coherently, and is, for the most part, as capable as most people of this age of coming to reasonable conclusions about relationships between events and of maintaining a connected flow of associations in which ideas follow each other in a comprehensible fashion.

c.  This young person appears to have adequate abilities to identify with real people in her life. This ability, if combined with adequate opportunity to model herself after real people she knows well, should facilitate a clear and stable sense of her personal identity.

d.  This person is more likely than most people of this age to demonstrate generally adaptive interpersonal behavior most of the time.

*Id.* ¶ 8(B). Dr. Roll concludes that Dr. Kaven's overall assessment of "generally adaptive interpersonal behavior most of the time" is inconsistent with a need for forced hospitalization or psychotropic medication. *Id.* ¶ 8(D).

## II.   PROCEDURAL HISTORY

Plaintiffs sued under 42 U.S.C. § 1983, asserting that Defendants violated their Fourteenth Amendment rights to direct their child's medical care and to familial association. *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014). Defendants filed a motion to dismiss based on absolute and qualified immunity. *Id.* This Court granted the motion to dismiss, holding that Defendants were entitled to qualified immunity. *Id.*

On appeal, the Tenth Circuit affirmed the dismissal of Plaintiffs' right to direct medical care claim, but reversed the dismissal of Plaintiffs' familial association claim. *Id.* at 1198. With respect to the familial association claim, the Tenth Circuit determined that the "infringement on the Thomases' right to familial association stemmed solely from the emergency medical hold the

14

defendants placed on M.T. prior to the filing of the petition." *Id.* at 1193. The Tenth Circuit therefore limited its assessment of the substantive due process claim to the placement of the medical hold. *Id.* at 1195.

The Tenth Circuit then set forth the elements necessary for Plaintiffs to state a claim for deprivation of the right of familial association: (1) Defendants intended to deprive Plaintiffs of their protected relationship with their daughter; and (2) balancing Plaintiffs' interest in their protected relationship with their daughter against the state's interest in her health and safety, Defendants either unduly burdened Plaintiffs' protected relationship, or effected an unwarranted intrusion into that relationship. *Id.* at 1196. "In conducting this balancing, the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action." *Id.*

The Tenth Circuit concluded that the facts of the complaint sufficiently stated a claim for deprivation of the right to familial association because Dr. Del Fabbro's placement of the medical hold on MT had the purpose and effect of preventing Mrs. Thomas from removing MT from the hospital. *Id.* The court determined that the complaint sufficiently alleged that all defendants were involved in the decision to retain custody of MT at the time. *Id.*

The Tenth Circuit then turned to Defendants' argument that they are entitled to qualified immunity because Plaintiffs failed to show an immediate threat to MT's life did not exist. *Id.* The Tenth Circuit reasoned as follows:

> The scope of the right to familial association, at least in the context of deprivation of parental custody in certain circumstances, is clearly established. But at this stage in the proceedings, we do not have the information necessary to determine whether a state interest in M.T.'s health and welfare existed such that it would have been justified for the defendants to infringe upon the Thomases' right to familial association. Whether the right to familial association has been violated requires the court to conduct a fact-intensive balancing test not ordinarily suitable for the Rule 12(b)(6) stage. When the facts have not yet been fully brought out

through discovery, it is difficult for the court to adequately conduct the relevant constitutional test….

The facts alleged in the Thomases' complaint, when accepted as true and viewed in a light favorable to the plaintiffs, do not show an immediate threat of suicide had M.T. been discharged. The complaint does allege that suicidal ideation was a basis for M.T.'s intake, diagnosis, and course of treatment. But the complaint does not contain facts showing M.T.'s suicide risk on April 29, the day the defendants instituted the medical hold and allegedly violated the plaintiffs' constitutional rights. Although the complaint avers that M.T. expressed suicidal ideation on May 4, the complaint does not provide sufficient information or context for determining the immediacy or seriousness of the suicide threat during the course of the seven-day hold. Moreover, the complaint alleges the defendants chose to discharge M.T. because they determined her insurance would not cover the involuntary commitment, and not because her medical condition improved. Thus, to be able to adequately determine whether officials of reasonable competence could disagree as to the danger of discharging M.T., the court must allow for some factual development of the record. *The defendants will be entitled to qualified immunity if reasonable officers could at least disagree as to the danger of discharging M.T.*

*Id.* at 1196-97 (internal footnote omitted; italics added).

## III.    STANDARD

In order to defeat the qualified immunity defense, the plaintiff must both "demonstrate that the defendant's actions violated a constitutional or statutory right" and "show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (emphasis added). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the case before it. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). For a right to be clearly established under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995) (quotation omitted). A plaintiff can demonstrate that a

constitutional right is clearly established by references to on-point cases from the Supreme Court, the Tenth Circuit, or the clearly established weight of authority from other circuits. *Archuleta*, 523 F.3d at 1283.

On summary judgment, the court must consider the evidence in the light most favorable to the plaintiff when conducting the qualified immunity analysis. *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). If the plaintiff carries his burden on qualified immunity, the burden shifts to the defendant to show that there are no genuine factual issues and she is entitled to judgment as a matter of law. *Albright*, 51 F.3d at 1535.

IV.   **ANALYSIS**

A.   **Dr. Del Fabbro**

1.   **Whether Dr. Del Fabbro violated Plaintiffs' liberty interest in familial association**

The parental relationship is a constitutionally protected liberty interest. *Lowery v. County of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). To state a claim, Plaintiffs must show that (1) Defendants intended to deprive them of their protected relationship with MT, and (2) balancing Plaintiffs' interest in that relationship against the State's interest in MT's health and safety, Defendant either unduly burdened Plaintiffs' protected relationship or effected an unwarranted intrusion into that relationship. *Thomas*, 765 F.3d at 1196. The Court will examine each element in turn.

a.   **Intent to interfere**

Defendants contend that the record establishes that Dr. Del Fabbro acted with the intent to keep MT safe from self-harm, not to interfere with the parental relationship. Dr. Del Fabbro,

however, clearly understood that placing the medical hold on MT would prevent MT from leaving the hospital with her parents, depriving them of their relationship with her. Plaintiffs have thus met their burden to show that Dr. Del Fabbro intended to deprive them of their protected relationship in placing the medical hold on MT, the purpose and effect of which was "to prevent Mrs. Thomas from removing M.T. from the hospital." *Id. See also Lowery*, 522 F.3d at 1093 (quotation omitted) ("The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship.").

### b. Balancing of interests

In balancing the rights of parents and the State, the Court must consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action. *Thomas*, 765 F.3d at 1196. As for the first factor, denying a parent the care and custody of their child, even temporarily, is a severe infringement on the protected relationship and weighs strongly in favor of Plaintiffs. *Cf. PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1199 (10th Cir. 2010) (describing parents' interest in associating with their child "unquestionably of paramount importance" and explaining that forced separation of parent from child, even for short time, is a "serious impingement"). The fact that MT was already in the custody and care of UNM Hospital, that Plaintiffs signed a consent form acknowledging they were informed of the process by and circumstances under which UNM Hospital might institute involuntary commitment proceedings, and that the hold was less than a week does not diminish the seriousness of the impingement of preventing parents from re-taking custody and care of their child. The Court disagrees with Defendants that the intrusion in this case is "minimal."

The State, however, has a compelling interest to protect the life and health of children within its borders. *See id.* at 1198. The Court must thus examine whether Plaintiffs have shown a question of fact exists that the need for Defendants' conduct was not sufficiently strong, and that other medical actions short of a medical hold could be taken, that would not justify infringement on the parental relationship. Defendants rely significantly on the undisputed fact that on April 28, 2010, the day before Dr. Del Fabbro instituted the medical hold, MT stated an 8 out of 10 desire to hurt herself and a 5 or 6 out of 10 to take her own life. They also contend that MT's history of self-cutting, reported prior suicidal thoughts and attempts, and fact that MT's home had guns and knives added to the reasonableness of Dr. Del Fabbro's belief that there was an immediate need to protect MT's safety through a medical hold.

Other evidence in the record, construed in Plaintiffs' favor, creates a genuine material issue of fact as to the immediacy and need for the medical hold and indicates that alternative courses of action were available. It is undisputed that on May 4, 2010, MT reported that "these are the worst [suicidal ideations] I have had since prior to admission; I am fit to bust." Nevertheless, the very next day, when hospital staff learned MT's insurance would not cover her continued involuntary stay, Ms. Straits called Mrs. Thomas to have her pick up MT and on May 6, 2010, Dr. Del Fabbro released the medical hold. Construing the facts in the light most favorable to Plaintiffs, a jury could find that MT's suicide risk on April 29, 2010 was the same or less than that on May 4, 2010, yet Defendants did not believe the immediacy and seriousness on the latter date justified a forced separation of Plaintiffs from their child, once they learned there were no pockets from which to pay for the stay. The Tenth Circuit already indicated that these allegations were significant in the analysis of determining whether the suicide threat was of such immediate or serious nature to justify the severe infringement. *See Thomas*, 765 F.3d at 1197

("Moreover, the complaint alleges the defendants chose to discharge M.T. because they determined her insurance would not cover the involuntary commitment, and not because her medical condition improved.").

Additionally, Plaintiffs have provided evidence from Dr. Roll that MT's psychological evaluation did not support the diagnoses of major depressive disorder or clinical suicidal potential or the remedy of forced hospitalization. Specifically, he points to Dr. Kaven's statements in the test results that MT "appears to have sufficient psychological resources to cope adequately with the demands being imposed on her by internal and external events in her life" and "is more likely than most people of this age to demonstrate generally adaptive interpersonal behaviors most of the time." Aff. of Dr. Roll ¶¶ 8(B)(a) and (d), ECF No. 102-9. He opines that Dr. Kaven's stated belief that supportive therapy is the best treatment for MT discredits their efforts for forced hospitalization. *Id.* ¶ 8(D). The Court recognizes Defendants have asserted multiple grounds upon which to test the credibility of Dr. Roll and undermine the weight to give his testimony, but at this stage, the Court must view in Plaintiffs' favor his relevant opinions. This evidence supports Plaintiffs' position that MT's comments on April 29, 2010, when viewed in conjunction with her psychological evaluation, were not a sufficiently credible threat to support the medical hold. *Cf. Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1245-46 (10th Cir. 2003) (noting that "mere possibility" of danger is not enough to justify removal of child from parents' home without appropriate process and determining that plaintiffs alleged violation of Fourteenth Amendment procedural due process rights because facts showed emergency circumstances did not exist to justify immediate removal from home) (quoting with approval *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999)).

As for the third factor in the balancing test, the record shows a caring mother attempting to make the best treatment options for her child, who investigated the treatment options recommended by Dr. Del Fabbro, and who had reasonable grounds for disagreeing with the proposed treatment of psychotropic medications, as well as for believing her daughter might be malingering. Mrs. Thomas told the medical team that the guns in their home were locked up. Mrs. Thomas expressed her openness to alternative medical treatments, before resorting to medication. There is evidence that during the April 29, 2010 meeting with MT's doctors, Mrs. Thomas said she had arranged for outpatient treatment and family therapy, alternative treatments that Defendants found sufficient to support releasing the medical hold – once they were informed that Plaintiffs' insurance funds may have evaporated. Viewing the record in Plaintiffs' favor, Defendants could have pursued those alternative treatments on April 29, 2010, instead of imposing the medical hold. *Cf. Jensen*, 603 F.3d at 1199 (holding that plaintiffs failed to show defendant imposed an undue burden on their familial relationship where state never physically removed child from parents' custody and state afforded parents numerous opportunities to obtain treatment for child before it sought to remove him). The third factor thus supports Plaintiffs' claim.

Weighing all the relevant evidence in Plaintiffs' favor, a jury could find that there was no immediate need for the medical hold, there were alternative courses of treatment, and the balance of interests weighed against separating Plaintiffs from their child. Accordingly, Plaintiffs have met their burden on the first prong of the qualified immunity analysis of demonstrating that questions of fact exist as to whether Defendants violated their constitutional right to familial association. *See Thomas*, 765 F.3d at 1196-97 (concluding that facts as alleged in complaint sufficiently stated claim for deprivation of right to familial association, even though complaint

alleged suicidal ideation was basis for MT's intake, diagnosis, and course of treatment, because other allegations in complaint, construed in plaintiffs' favor, did not show immediate threat of suicide had MT been discharged).

### 2. Whether the constitutional right was clearly established

It is not sufficient, however, to show only that a genuine issue of material fact exists as to whether a constitutional violation occurred. Defendants are entitled to qualified immunity "if reasonable officers could at least disagree as to the danger of discharging M.T." *Id.* at 1197. Accordingly, to overcome Defendants' qualified immunity defense on summary judgment, Plaintiffs must show that the record construed in their favor supports a conclusion that no reasonable officer could disagree as to the danger of discharging MT.

"The scope of the right to familial association, at least in the context of deprivation of parental custody in certain circumstances, is clearly established." *Id.* at 1196. At the time of the incident, it was clearly established that Defendants could not place a medical hold that infringed on a parent's right to the care and custody of their child without an immediate health or safety risk to that child. *See id.* at 1197. Plaintiffs have shown sufficient facts that undermine the purported immediacy of the need to place a medical hold on MT and indicate that Defendants' belief concerning the danger of releasing MT was not sincerely held or reasonable. As discussed above, there is a material factual issue concerning whether MT's medical condition improved over the course of the hold or whether MT's suicidal ideation remained unchanged and the availability of insurance coverage was the only factor that changed to cause Dr. Del Fabbro to reconsider her commitment to forced hospitalization. A jury could find based on the record that there was no immediate need to place a medical hold on MT on April 29, 2010, and that Dr. Del

22

Fabbro's stated belief concerning the risk to MT upon discharge was not sincerely or reasonably held on April 29, 2010. Although qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), Dr. Roll's opinions also place the competence and reasonableness of Dr. Del Fabbro's judgment at issue as a factual matter. A jury could rely on his opinions and the record to find that no reasonable official, considering MT's entire medical record and medical history, would find that MT was in sufficient immediate danger to require forced hospitalization, rather than lesser intrusive treatments. Defendants acknowledge that Dr. Roll's opinions are "both disputed and material." Defs.' Reply 12, ECF No. 103. Although the objective legal reasonableness of the official's actions is a legal question, where the historical facts material to the issue are in dispute, there is an issue for the jury. *Roska*, 328 F.3d a 1251.

For the same reasons, Dr. Del Fabbro cannot rely on Section 32A-6A-22 of the New Mexico Children's Code, which allows the involuntary placement of a child to residential care on an emergency basis when the person seeking the placement "believes that the child is likely to cause serious bodily harm to self or to others." N.M. Stat. Ann. § 32A-6A-22(N). The evidence construed in Plaintiffs' favor suggests that Dr. Del Fabbro did not sincerely believe that MT was likely to cause serious bodily harm to herself, and that even if her belief was sincere, it may not have been reasonable based on all the medical evidence. The constitutional law was clear that an immediate danger must exist to justify the forced separation of parent from child. The statute would not have prevented Dr. Del Fabbro from knowing that her actions in placing a medical hold would be unconstitutional if she had no reasonably held belief of an immediate danger to the child. *Cf. Roska*, 328 F.3d at 1252 (stating that reliance on state statute authorizing child's

23

removal "alone could not render the defendants' conduct objectively reasonable, insofar as the statute did not authorize the unconstitutional conduct in question").

This Court recognizes the difficult situation Dr. Del Fabbro faced. At this stage, however, the Court must view all facts and inferences in Plaintiffs' favor. A jury must resolve the material disputes of fact that exist in this case. Because the Court finds that there is evidence in the record in favor of Plaintiffs that shows that Dr. Del Fabbro's placement of the medical hold may not have been objectively reasonable and that reasonable officials in her position would have pursued an alternative remedy to forced hospitalization, the Court will deny Defendant Del Fabbro qualified immunity. *See Thomas*, 765 F.3d at 1196-97 (suggesting that if record on summary judgment showed that there was no immediate threat of suicide on April 29, 2010, law was clearly established that there was an insufficient state interest in MT's health and welfare to justify severe intrusion of forced separation of parent from child). *Cf. Suasnavas v. Stover*, 196 F. App'x 647, 657-58 (10th Cir. Aug. 25, 2006) (in denying qualified immunity on a motion to dismiss, explaining that factual question of whether defendants had reasonable suspicion that step-grandfather posed threat to his grandchildren must be explored in depth); *Roska*, 328 F.3d at 1250 (denying qualified immunity on Fourteenth Amendment familial association claim to social workers who removed child from home because they suspected his mother had Munchausen Syndrome by Proxy and was inflicting physical harm on her child, because record showed child's health and safety were not in immediate danger).

### B.  Dr. Kaven and Ms. Straits

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). The question is

whether the defendant personally participated in the "specific constitutional violation complained of." *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). An official who causes a citizen to be deprived of his constitutional rights can be held liable if the official set in motion a series of events that he or she knew or reasonably should have known would cause others to violate a citizen's constitutional rights. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)). Defendants Kaven and Straits argue they are entitled to summary judgment because they had no personal participation in the specific constitutional violation about which Plaintiffs complain, i.e., placement of the medical hold. Plaintiffs contend that Defendants Kaven and Straits participated in the constitutional violation by creating some of the medical records and reports upon which Dr. Del Fabbro relied and by preparing the paperwork for the hold and the later charges of neglect made to the State. *See* Pls.' Resp. ¶ 23, ECF No. 101.

It is undisputed that Dr. Del Fabbro solely made the decision to place the medical hold on MT, and in doing so, did not rely on the psychological evaluation of Dr. Kaven and Ms. Straits. Consequently, even if Dr. Kaven and Ms. Straits' psychological evaluation misdiagnosed depression, clinical suicidal potential, and schizophrenia, those actions did not cause the constitutional injury of which Plaintiffs complain. The record shows that Dr. Kaven and Ms. Straits were part of MT's medical team; they discussed their concerns about Mrs. Thomas' refusal to allow administration of SSRIs and her disagreements with the team's diagnosis and treatment among themselves and Dr. Del Fabbro; and they were present when Dr. Del Fabbro told Mrs. Thomas that she had chosen to put a hold on MT. That evidence, however, does not establish that Dr. Kaven and Ms. Straits set in motion the events that would cause Dr. Del Fabbro to violate Plaintiffs' rights by placing the initial medical hold or that they knew or reasonably

should have known that their actions would cause the hold. *Cf. Henry*, 658 F.3d at 1241 (explaining that personal participation in specific asserted constitutional violation is essential and holding that officer, even though she eventually participated in plaintiff's detention, did not herself engage in discriminatory conduct).

Finally, there is no evidence indicating Ms. Straits' actions in contacting CYFD to complain about the Thomases' alleged medical neglect and helping file the Petition caused Dr. Del Fabbro to place the medical hold on MT. The Tenth Circuit expressly limited the claim to the placement of the medical hold, not seeking an involuntary residential treatment order in state court. *Thomas*, 765 F.3d at 1195. Nor is there any evidence in the record suggesting that Dr. Del Fabbro would have immediately abandoned her decision to place or continue with the medical hold had Defendants Kaven and Straits voiced objections to that hold. Accordingly, Defendants Kaven and Straits are entitled to summary judgment and will be dismissed from the case for lack of personal participation in the placement of the medical hold.

**IT IS THEREFORE ORDERED** that Defendants' Second Motion for Summary Judgment and Supporting Brief (**ECF No. 77**) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' motion for summary judgment is **GRANTED** as to Defendant Mary Kaven, Ph.D. and as to Defendant Jill Straits.
2. Defendant Mary Kaven, Ph.D. and Defendant Jill Straits are **DISMISSED WITH PREJUDICE** from the case.

3.  Defendants' motion for summary judgment is **DENIED** as to Defendant Anilla Del

Fabbro, M.D.


_____

**UNITED STATES DISTRICT JUDGE**